UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEROME CROMWELL, *on behalf of himself and all other employees similarly situated,* <br><br> *Plaintiffs,* <br><br> v. <br><br> NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, BELLEVUE HOSPITAL CENTER, KINGS COUNTY HOSPITAL CENTER, JACOBI MEDICAL CENTER, ELMHURST HOSPITAL CENTER, HARLEM HOSPITAL CENTER, METROPOLITAN HOSPITAL CENTER, LINCOLN MEDICAL AND MENTAL HEALTH CENTER, NORTH CENTRAL BRONX HOSPITAL, CONEY ISLAND HOSPITAL, WOODHULL MEDICAL AND MENTAL HEALTH CENTER, QUEENS HOSPITAL CENTER, AND ALAN D. AVILES, <br><br> *Defendants.* | COMPLAINT- CLASS ACTION AND DEMAND FOR JURY TRIAL <br><br><br> Civil Action No. 12-cv-4251 |

## NATURE OF CLAIM

1.     This is a proceeding for injunctive and declaratory relief and monetary damages to redress the deprivation of rights secured to plaintiff Jerome Cromwell, as well as all other employees similarly situated, under the Fair Labor Standards Act of 1938 ("FLSA"), as amended 29 U.S.C. § 201 *et seq.,* and the New York Labor Law ("NYLL").

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; under 28 U.S.C. § 1337 conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; under the Declaratory

Judgment Statute, 28 U.S.C. § 2201; and under 29 U.S.C. § 216(b).

3.     This Court's supplemental jurisdiction of claims arising under New York State law is also invoked.

4.     Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391 (b) and (c) because, among other reasons, the defendants are residents of and do business in this district.

## CLASS ACTION ALLEGATIONS

5.     The claims arising under the New York State law are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

6.     The class action is maintainable under subsections (1), (2) and (3) of Rule 23(b).

7.     Common questions of law and fact predominate in this action because the claims of all class members are based on whether defendants' practice of not paying hourly employees for all hours worked and/or overtime for hours worked over forty per week violates the law.

8.     The class is defined as current and former employees who were suffered or permitted to work by defendants but were not paid for all time worked, including the applicable statutory premium rate for overtime work, and who were paid an hourly wage by defendants ("Class Members").

9.     The class size is believed to be over 40 employees.

10.     The Plaintiff will adequately represent the interests of the Class Members because he is similarly situated to the Class Members and his claims are typical of, and concurrent to, the claims of the other Class Members.

11.     There are no known conflicts of interest between the Plaintiff and the other Class Members.

12.     The Class Counsel, Thomas & Solomon LLP, is qualified and able to litigate the Plaintiff's and Class Members' claims.

13.     The Class Counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under federal wage and hour laws.

14.     The class action is maintainable under subsections (2) and (3) of Rule 23(b) because the Plaintiff and Class Members seek injunctive relief, common questions of law and fact predominate among the Plaintiff and Class Members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## PARTIES

### A.     Defendants

15.     New York City Health and Hospitals Corporation, Bellevue Hospital Center, Kings County Hospital Center, Jacobi Medical Center, Elmhurst Hospital Center, Harlem Hospital Center, Metropolitan Hospital Center, Lincoln Medical and Mental Health Center, North Central Bronx Hospital, Coney Island Hospital, Woodhull Medical and Mental Health Center, Queens Hospital Center (collectively, "HHC" and together with Alan D. Aviles "defendants") are related organizations through, for example, common membership, governing bodies, and trustees and/or officers.

16.     New York City Health and Hospitals Corporation is comprised, in part, of the Bellevue Hospital Center, Kings County Hospital Center, Jacobi Medical Center, Elmhurst Hospital Center, Harlem Hospital Center, Coler-Goldwater Specialty Hospital and Nursing

Facility, Metropolitan Hospital Center, Lincoln Medical and Mental Health Center, North Central Bronx Hospital, Coney Island Hospital, Woodhull Medical and Mental Health Center, and Queens Hospital Center.

17.     HHC is an enterprise engaged in the operation of hospitals and/or the care of the sick and is a healthcare consortium.

18.     Defendants operate over 150 health care facilities and centers and employ approximately 40,000 individuals.

19.     The FLSA defines "employer" to include any person acting directly or indirectly in the interest of an employer in relation to an employee and an employee is anyone who is suffered or permitted to work.  As a result, including as further described below, the defendants are liable as employers under the FLSA.

20.     Defendants are also jointly and severally liable as joint employers under 29 C.F.R. § 791.2 for the violations complained of herein.

21.     In particular, the regulations allow for joint and several liability if employers are not acting entirely independently of each other, or if employers are not completely disassociated from each other.  This includes when one employer controls, is controlled by, or is under common control with the other employer.  Commonly, this arrangement of employers is referred to as a "joint employer" or "single employer."

22.     Courts look to the economic realities of the enterprise and the totality of the circumstances to determine whether there is a joint or single employer relationship.

23.     Here, defendants are jointly and severally liable under the Department of Labor regulations because they act directly or indirectly in the interest of an employer, and because they are not acting entirely independently or are not completely disassociated from

each other.  *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion No. FLSA2005-15 (April 11, 2005) attached hereto as <u>Exhibit A</u>.  The following facts set forth some examples of the legal and factual bases supporting joint and several liability under the statute and regulations.

24.     In fact, defendants describe themselves as one of the largest municipal health care organizations in the country.

25.     Further, HHC claims to be a $6.7 billion integrated health care delivery system.

26.     As an integrated healthcare system, defendants have a centralized job posting system.

27.     Additionally, defendants have centralized supply chain management, and financial, computer, payroll and health records systems that are integrated throughout their locations.

28.     Defendants also share common management, including oversight and management by a senior executive team and board of directors.

29.     Defendants have common ownership.

30.     Collectively, HHC comprises a single, integrated enterprise, as its entities perform related activities through common control for a common business purpose.

31.     Therefore, defendants constitute an integrated, comprehensive, consolidated health care delivery system, offering a wide range of services.

32.     At all relevant times, defendants have suffered or permitted Plaintiff and Class Members to perform work for them at their various health care locations.

33.     These facts also support liability of the defendants based on principal/agency liability and as alter egos.  For example, as discussed herein, the component entities

implemented the policies as required by HHC due to the control HHC exercises over them, causing the fraud and wrongs at issue in this case.

34.    Defendants are also liable to Plaintiff and Class Members under a theory of joint venture.  Defendants maintain operational control over a venture providing healthcare services and have entered into an agreement with each other, established through, for example, their conduct in sharing the profits and losses.

35.    Defendants jointly managed and controlled this venture as well as its employees and assets.  Further, as discussed above, HHC claims to be a $6.7 billion dollar integrated health care delivery system.

36.    Defendants are jointly and severally liable to the Plaintiff and Class Members for the damages arising out of this joint venture.

37.    Based in part on the foregoing, defendants are also jointly and severally liable for the violations occurring at each of their locations, including at their approximately 164 health care facilities and centers and more than 50 affiliated health care facilities and centers.

38.    For the same reasons, defendants are jointly and severally liable to Plaintiff and Class Members under the NYLL.

39.    HHC is not a political subdivision as intended under the New York Labor Law.

40.    HHC was created in order to allow it to operate separately from the City of New York without regulations and rules that might inhibit it from doing business in a more streamlined manner.

41.    The legislature provided HHC with a distinct corporate, legal, and financial identity allowing it to benefit from private management. N.Y. Unconsl. Laws § 7382.

42.    As such, HHC is not a federal, state, or municipal government.

43.     HHC is also not a political subdivision of a federal, state, or municipal government.

44.     HHC is not a City of New York department.

45.     HHC has an independent board of directors. N.Y. Unconsl. Laws § 7384.

46.     HHC has a Human Resources Department separate from the City of New York.

47.     HHC has its own separate legal counsel and department.

48.     HHC can change its own by-laws, rules, and regulations independent from the City of New York.   N.Y. Unconsl. Laws § 7385 (3).

49.     HHC has substantial control over hiring and controlling its employees. N.Y. Unconsl. Laws § 7385 (11).

50.     HHC hires and fires its own employees, separately from the City of New York. N.Y. Unconsl. Laws § 7385 (12).

51.     HHC disciplines its own employees, separately from the City of New York. N.Y. Unconsl. Laws § 7385 (12).

52.     HHC has the power to control employees' contract terms and conditions. N.Y. Unconsl. Laws § 7385 (12) (authorizing HHC to "promulgate rules and regulations relating to the creation of classes of positions, position classifications, title structure, class specifications, examinations, appointments, promotions, voluntary depositions, transfers, re-instatements, procedures relating to abolition or reduction in positions, to determine the number of and to appoint, remove and discipline employees, to prescribe their duties, fix their qualifications, salaries, wages, fringe benefits, hours, work schedules, assignments and re-assignments, leaves of absence, annual leave, other time and leave rules and other terms of

-7-

employment").

53.    HHC determines position classifications, separately from the City of New York. N.Y. Unconsl. Laws § 7385 (12).

54.    HHC may employ its own officers and employees.  N.Y. Unconsl. Laws § 7385 (11).

55.    These officers have the ability to formulate or participate in the formulation of the plans, policies, aims and standards of the corporation.  N.Y. Unconsl. Laws § 7385 (11).

56.    HHC has the ability to sue or be sued. N.Y. Unconsl. Laws § 7385 (1).

57.    HHC manages its finances separately from the City of New York.

58.    HHC has the ability to borrow money, and to acquire or sell property. N.Y. Unconsl. Laws § 7385 (4)(6).

59.    HHC has discretion as to investing its reserves.  Unconsl. Laws § 7385 (16).

60.    HHC has the ability to exercise discretion as it relates to its finances.  Unconsl. Laws § 7385 (17).

61.    HHC has power to execute its own contracts, leases and other agreements. N.Y. Unconsl. Laws § 7385 (5).

62.    HHC manages its budget, funded by revenue that is generated from patient services, separately from the City of New York.

63.    According to its website, HHC fulfills its mission by providing medical, mental health and substance abuse services throughout its locations.  Further, approximately 35% of the people served are uninsured.

64.    Additionally, according to the New York City Council's HHC Budget Overview for 2011, approximately 80% of the $6.7 billion operating budget was derived from

third party revenue.

65.     HHC is liable as an employer under NYLL and should not be able to "avoid the costs associated with independence from the State." *Massiah v. MetroPlus Health Plan, Inc.,* No. 11 Civ. 5669, 2012 WL 1267795, at *5 (E.D.N.Y. Apr. 11, 2012).

**Alan D. Aviles**

66.     Under the FLSA, individuals can also be held individually liable for violations of its provisions.  *See* 29 U.S.C. § 203(d).

67.     Alan D. Aviles is the President and Chief Executive Officer ("CEO") of HHC.

68.     As the President and CEO of New York City Health and Hospitals Corporation, Mr. Aviles has operational control over HHC.

69.     In his role, Mr. Aviles is a member of the Board of Directors, allowing him to control significant functions of HHC, including centralizing the structure for decision making and developing the overall public relations.

70.     In concert with others, Mr. Aviles has the authority to, and does, make decisions that concern defendants' operations, including functions related to employment, human resources, training, payroll, and benefits.

71.     For example, Mr. Aviles has the authority to, and does, make decisions that concern the reviewing and counseling of defendants regarding employment decisions, including hiring and firing of Plaintiff and Class Members.

72.     Mr. Aviles, as President and CEO, has the ability, and does, control employee work schedules, including layoffs, closure of clinics and contracting out jobs.

73.     As President and CEO, Mr. Aviles is involved in the staffing of HHC.   In fact, after an investigation revealed that nearly 4,000 echocardiograms remained unread within

HHC, Mr. Aviles made staffing changes in order to immediately deal with the situation.

74.     Mr. Aviles has the authority to, and does, make decisions that concern payroll functions across HHC.

75.     In concert with others, Mr. Aviles has the authority to, and does, make decisions that concern employees' schedules, hours and standard terms of employment.

76.     Mr. Aviles has the primary responsibility for management and implementation of policies as President and CEO of HHC.

77.     According to defendants' website, Mr. Aviles is involved in strategically investing money and using technology to enhance HHC.

78.     In his role as President and CEO, Mr. Aviles has significant control over the managing of HHC.  For example, Mr. Aviles recently presented a restructuring and cost containment plan for the healthcare system.

79.     Under Mr. Aviles, HHC has been experiencing a transformation of rebuilding and modernizing the infrastructure.

80.     In his role, Mr. Aviles is involved in communications to employees.   For example, in 2008 he sent a message to all HHC employees regarding a death in one of their waiting rooms.

81.     Mr. Aviles serves on the boards of a number of organizations, including the Greater New York Hospital Association, the Healthcare Association of New York State, the Primary Care Development Corporation, and Public Health Solutions (formerly MHRA), further extending his role as a leader of HHC.

82.     Due in part to his role, Mr. Aviles has the authority to, and does, make decisions concerning the policies defendants adopt and the implementation of those policies.

83.     Further, Mr. Aviles, in concert with others, is involved in the creation and/or maintenance of the illegal policies complained of in this case.

84.     Based upon the foregoing, Mr. Aviles is liable to Plaintiff and Class Members because of his operational control over the corporation, his status as an employer, and/or according to law.

**B.     Plaintiffs**

*Named Plaintiff*

85.     At all relevant times, Jerome Cromwell ("Named Plaintiff") was an employee under the FLSA and NYLL, and employed by defendants within this district.

86.     Jerome Cromwell worked at defendants' Woodhull location from approximately October 10, 1989 until February 1, 2010 as hospital police.

87.     As hospital police for defendants, Plaintiff Cromwell was typically scheduled from 11 pm until 7 am five days a week totaling 37.5 hours, excluding time for which Mr. Crowell did not receive compensation.  However, approximately twice a month Mr. Cromwell picked up an additional 7.5 hour shift resulting in a weekly total of 45 hours, excluding time for which he was not compensated.

88.     In addition to the scheduled hours listed above, Mr. Cromwell worked time for which he did not receive compensation, as discussed below, during his missed and interrupted meal breaks, while he was, for example, responding to emergencies in the psychiatric unit or emergency room, attending to patients, looking for missing patients, or dealing with electronic and technological failures.  Mr. Cromwell estimates that he worked through his meal break approximately 20% of the time, and worked through part of his meal break an additional 20% of the time.   Mr. Cromwell also worked before his scheduled start

time in order to prepare for policing duties and participate in mandatory roll call, typically resulting in an additional 60 minutes each shift; after his scheduled shift approximately twice a week for twenty minutes while he was required to remain after his shift waiting for his relief; and in-service training on his duties including how to deal with emergencies, fires, and escorting patients, resulting in approximately one hour every two years.  This additional uncompensated time of at least 6 hours and 40 minutes during weeks without training and 7 hours and 40 minutes during weeks with training often should have been paid at overtime rates when Mr. Cromwell's scheduled shifts exceeded 40 hours in a week, as discussed above, or when the uncompensated time pushed his hours for the week over 40.

89.     Plaintiff Cromwell was a member for the International Brotherhood of Teamsters Local 237 and subject to their CBA.[1]  *See* Exhibit B International Brotherhood of Teamsters Local 237 CBA dated September 13, 2008 until September 25, 2010.

90.     Plaintiff does not meet any exemptions under the FLSA or NYLL.

*Class Members*

91.     The Class Members are those current and former employees as defined above.

92.     Plaintiff and Class Members are similarly situated.

## BASES FOR LIABILITY

93.     As set forth more fully in this complaint, the defendants are liable for failing to pay the Plaintiff and Class Members for all compensable time worked under the FLSA and NYLL.

---

[1]     Pursuant to the Court's order, Plaintiff Cromwell responds that he has no other CBAs in his possession. *See Yarus v. New York City Health and Hospitals Corp.,* 10 civ. 2662, 2011 WL 321186, at *1 (S.D.N.Y. Jan. 28, 2011).  Plaintiff in no way admits that such CBAs have any relevance to his claims and instead assert that the provisions of the CBA are immaterial to his claims.

94.     As to the defendants' legal obligations to pay Plaintiff and Class Members for all compensable time worked, the defendants' liability arises because the defendants knowingly permitted the Plaintiff and Class Members to perform work for which they did not pay the Plaintiff and Class Members as required by the FLSA and NYLL.  In addition to offering proof that defendants did not pay Plaintiff and Class Members for work that they knowingly permitted the Plaintiff and Class Members to perform, liability for these violations can be proven in a variety of ways.  Several non-exclusive examples of how such liability can be proven are as follows:

   a.   The defendants have a non-delegable legal obligation to ensure that Plaintiff and Class Members are paid for all time they permit the Plaintiff and Class Members to work. Therefore, it is illegal for the defendants not to pay Plaintiff and Class Members for all compensable time worked, and specifically including any that arises from the defendants' attempts to shift to Plaintiff and Class Members the statutory obligations that defendants pay Plaintiff and Class Members for all compensable time.

   b.   Alternatively, in terms of payment for meal breaks, it is illegal for defendants to automatically deduct meal periods from Plaintiff's and Class Members' pay when the defendants are knowingly permitting the Plaintiff and Class Members to work during that time.

   c.   Alternatively, Plaintiff and Class Members can demonstrate that the failure to pay for time worked was in fact the common practice of defendants.

   d.   Alternatively, if defendants choose not to pay for work performed by Plaintiff and Class Members and assert a defense that compensation for that time is not owed, to be successful, defendants must prove that they used all reasonable efforts to prevent the work from being performed and all reasonable efforts to inquire and pay for work that is performed.

## FACTUAL BACKGROUND

95.     HHC is one of the largest health care providers in the New York City area.

96.     Across the United States, pay practices throughout the health care industry are being investigated for failure to properly pay hourly employees for all time worked, including

overtime to those employees working over 40 hours in a week.  *See* New York Times Article "Pay Practices in Health Care Are Investigated," attached hereto as <u>Exhibit C</u>.

97.    Class Counsel's investigation has confirmed that indeed there is a common practice in the healthcare industry that results in hourly employees not being compensated for all time worked, including overtime compensation.

98.    As discussed below, defendants maintained several illegal pay policies that denied Plaintiff and Class Members compensation for all hours worked, including applicable premium pay rates.

### *Meal and Break Deduction Policy*

99.    One of the policies resulting in Plaintiff and Class Members not receiving compensation for all time worked is defendants' "Meal and Break Deduction Policy." Defendants maintain the Meal and Break Deduction Policy throughout their facilities and centers.

100.    Under this policy, defendants' timekeeping system automatically deducts time from employees' paychecks each day for meals, breaks and other reasons.

101.    Plaintiff and Class Members are deducted at least thirty minutes from their pay each shift they work long enough for a meal break.  This deduction occurs on every shift to every Plaintiff and Class Member, regardless of their position, unit or location.

102.    Plaintiff and Class Members do in fact perform work during those breaks and are not paid for that time.  During this time, employees typically continue performing their regular duties, including responding to emergencies in the psychiatric unit or emergency room, attending to patients, looking for missing patients, or dealing with electronic and technological failures.

-14-

103.   Defendants' Meal and Break Deduction Policy is legally challengeable in several respects.

104.   First, despite automatically deducting time for meal breaks, defendants fail to ensure that employees do not perform work during those breaks.

105.   To the contrary, defendants actually knowingly permit Plaintiff and Class Members to be available to work throughout their shifts and consistently require their employees to work during their unpaid breaks.   This is particularly the case given that defendants operate on a 24/7 basis.   They do not shut down their operations or take other sufficient steps to ensure that employees do not perform work during the breaks which they automatically deduct.

106.   Nor do defendants prohibit Plaintiff and Class Members from working during their unpaid breaks and do not have rules against such work.

107.   Second, defendants admittedly shift their statutory obligation to record and pay for all hours worked to their employees.

108.   Regardless of the location, defendants' policies uniformly shift to the Plaintiff and Class Members the defendants' statutory responsibility to ensure that the Plaintiff and Class Members are paid for time worked during meal breaks.   In particular, at all of the defendants' locations, one of the common pillars of defendants' policy is that Plaintiff and Class Members are responsible for ensuring all time worked during meal periods is properly credited and paid to Plaintiff and Class Members.

109.   Defendants' policies and practices do not make the defendants and their managers the ones responsible for ensuring that time they permit Plaintiff and Class Members to work is paid and credited to the Plaintiff and Class Members.

110.   Pursuant to this policy at all locations, Plaintiff and Class Members will not necessarily be paid for compensable work during meal periods if they themselves do not assume the responsibility to ensure the wages are paid.

111.   Third, the Meal Break Deduction Policy results in extensive uncompensated work being performed by employees.

112.   As described by the Plaintiff, they like other Class Members often performed work during their meal breaks and as such their experiences are shared by all Class Members.

113.   At each of defendants' facilities each day Class Members work during a substantial percentage of meal periods and a substantially smaller number of meal periods are credited to the Class Members.

114.   The amount and frequency of such uncompensated work was so substantial that it reflects the defendants' actual policy or practice for the compensation of Plaintiff and Class Members during their meal periods.

115.   Fourth, defendants do not have available to them the defense that they have used all reasonable efforts to prevent uncompensated work from being performed and all reasonable efforts to inquire as to whether such work was being performed.

116.   As discussed above, the defendants made no efforts to prevent Plaintiff and Class Members from working during meal periods for which Plaintiff and Class Members were not compensated.

117.   Additionally, in terms of inquiring about whether employees were working uncompensated time, as well as making sure that work did not happen, defendants failed to conduct regular and effective audits and surveys which would have revealed the uncompensated work being performed by Plaintiff and Class Members.

118.   Further, defendants failed to adequately monitor employees to ascertain whether uncompensated work is being performed and to enforce policies which ensure compensation for all time worked.

119.   The defendants do not systematically review the records of their employees' work to determine if uncompensated work is being performed and whether there are inconsistencies between those records and the wage payments to Plaintiff and Class Members.

120.   Nor do defendants engage in effective training of their managers or their employees to ensure they understand that employees must be compensated for all hours worked, including during meal breaks.

121.   Moreover, reasonable efforts to record and pay employees properly would not include shifting to employees defendants' statutory obligations of properly recording time and compensating employees.

122.   The defendants did not routinely discipline employees who failed to record their meal breaks.

123.   The defendants do not take into account literature and surveys in the medical field which show that employees with similar job duties in the same or similar hospitals work during meal periods at far higher rates than that for which the defendants credit the Plaintiff and Class Members for such meal periods. The defendants have not attempted to systematically inquire as to whether such inconsistencies between such surveys and defendants' own payments to Plaintiff and Class Members indicates a serious, systemic problem in regards to Plaintiff and Class Members not getting paid for all time worked.

124.   Plaintiff and Class Members, regardless of location, position, unit or shift, are

subject to the Meal and Break Deduction Policy and are not fully compensated for work they perform during breaks.

125.   As a result of the uniform policy, Plaintiff and Class Members are entitled to compensation for all time they performed work for defendants, including during their unpaid breaks. Thus, overall, defendants' policy leads to employees not being compensated for all hours worked.

126.   In addition, defendants know or should have known that the Plaintiff and Class Members perform work during these meal and other unpaid breaks, but still do not pay them for this time pursuant to their Meal and Break Deduction Policy.

127.   One of the ways defendants are aware of such work being performed is because the defendants permit, and often request, that such work be done by the employees during their unpaid meal breaks.  This work is done on defendants' premises during operational hours, and in full view of the defendants' managers and supervisors.  Thus defendants permit that such work be done, and have actual and constructive knowledge it is being performed.

128.   Defendants also know that employees are receiving assigned tasks that must be completed by the appointed deadline, which results in employees having to work through their meal breaks even though they are not getting paid for the work.

129.   Accordingly, defendants should have known that Plaintiff and Class Members perform work during their unpaid breaks.  Even though defendants know or should have known their employees are performing such work, defendants fail to compensate their employees for such work.

130.   This additional uncompensated time should have been paid at overtime rates when Plaintiff, as discussed above, and Class Members' scheduled shifts exceeded 40 hours in

a week, or when the uncompensated time from missed or interrupted meal breaks, pre- and post- schedule work, and training time, pushed their hours for the week over 40.

131.   Plaintiffs and Class Members subject to the Meal and Break Deduction Policy are members of Class A.

*Unpaid Pre- and Post-Schedule Work Policy*

132.   Another policy resulting in uncompensated time for Plaintiff and Class Members is defendants' "Unpaid Pre- and Post-Schedule Work Policy."

133.   Under this policy, defendants suffered or permitted Plaintiff and Class Members to perform work before and/or after the end of their scheduled shifts.

134.   However, defendants failed to pay Plaintiff and Class Members for all time spent performing such work as a result of defendants' policies, practices and/or time recording system (the "Unpaid Pre- and Post-Schedule Work Policy").

135.   For example, employees were not permitted to record all of their work performed before or after scheduled shifts.

136.   Additionally, even if time was recorded before or after scheduled shifts, it was not compensated properly.

137.   Employees often had to complete their regular shift responsibilities before and/or after their scheduled shift ended. During this time, for example, employees prepared for their shifts, participated in mandatory roll call, and waited for relief. This time spent working was uncompensated.

138.   Defendants' Pre- and Post-Schedule Work Policy is also legally challengeable in several respects.

139.   First, despite not compensating employees for their work before and after their

scheduled shift, defendants fail to ensure that employees do not perform work before and after their shifts. As discussed above, defendants operate on a 24/7 basis and expect Plaintiff and Class Members to respond to the hospital demands regardless of whether it is outside of their scheduled shifts.

140. Additionally, defendants do not prohibit Plaintiff and Class Members from working before and after their shifts and do not have rules against such work.

141. Second, as stated above, defendants cannot shift their statutory obligation to record and pay for all hours worked to their employees, including requiring employees to record deviations from their scheduled hours. In fact, defendants routinely only paid employees for their scheduled shifts and not for work performed before and after employees' scheduled shifts.

142. Third, the Pre- and Post-Schedule Work Policy results in extensive uncompensated work being performed by employees.

143. As described by the Plaintiff, he like other Class Members often performed work during before and after their shifts and as such their experiences are shared by all Class Members.

144. The amount and frequency of such uncompensated work was so substantial that it reflects the defendants' actual policy or practice for the compensation of Plaintiff and Class Members for time worked before and after their shifts.

145. Fourth, defendants do not have available to them the defense that they have used all reasonable efforts to prevent uncompensated work from being performed and all reasonable efforts to inquire as to whether such work was being performed.

146. As discussed above, the defendants made no efforts to prevent Plaintiff and

Class Members from working before and after their scheduled shifts for which Plaintiff and Class Members did not receive compensation.

147.   Additionally, as discussed above, in terms of inquiring about whether employees were working uncompensated time, as well as making sure that work did not happen, defendants failed to conduct regular and effective audits and surveys which would have revealed the uncompensated work being performed by Plaintiff and Class Members and to adequately monitor employees to ascertain whether uncompensated work is being performed and to enforce policies which ensure compensation for all time worked.

148.   The defendants do not systematically review the records of their employees' work to determine if uncompensated work is being performed and whether there are inconsistencies between those records and the wage payments to Plaintiff and Class Members.

149.   Defendants also fail to engage in effective training of their managers or their employees to ensure they understand that employees must be compensated for all hours worked, including during before and after their shifts.

150.   Moreover, reasonable efforts to record and pay employees properly would not include shifting to employees defendants' statutory obligations of properly recording time and compensating employees.

151.   The defendants did not routinely discipline employees who fail to record work performed before and after their scheduled shifts.

152.   The defendants do not take into account literature and surveys in the medical field which show that employees with similar job duties in the same or similar hospitals perform work before and after their scheduled shifts.

153.   In addition, defendants know or should have known that the Plaintiff and Class Members perform work before and after their scheduled shifts, but still do not pay them for this time pursuant to their Pre- and Post-Schedule Work Policy.

154.   For example, defendants were aware such work was performed because the defendants permit, and often request, that such work be done by the employees.  This work is done on defendants' premises during operational hours, and in full view of defendants' managers and supervisors.  Thus defendants permit that such work be done, and have actual and constructive knowledge it is being performed.

155.   Plaintiff and Class Members also had conversations with defendants' managers in which they discussed how they were working before or after their scheduled shift and were not getting paid for such work.

156.   Defendants also know that employees are receiving assigned tasks that must be completed by the appointed deadline, which results in employees having worked beyond their scheduled shifts even though they are not being paid for the work.

157.   Although defendants, including managers, were aware employees performed this work beyond their scheduled work shifts, employees continued to perform work for which they were not compensated.

158.   This additional uncompensated time should have been paid at overtime rates when Plaintiff, as discussed above, and Class Members' scheduled shifts exceeded 40 hours in a week, or when the uncompensated time from missed or interrupted meal breaks, pre- and post- schedule work, and training time, pushed their hours for the week over 40.

159.   Plaintiff and Class Members subject to the Unpaid Pre- and Post-Schedule Work Policy are members of Class B.

*Unpaid Training Policy*

160.   Defendants also suffered or permitted Plaintiff and Class Members to attend compensable training programs.

161.   However, defendants fail to pay employees for all time spent attending such training sessions (the "Unpaid Training Policy").

162.   Often these training activities occurred during regular working hours; were required by defendants; were led by defendants; and were directly related to their position with defendants.   Further, Plaintiff and Class Members were often required to actively participate in the training.

163.   For example, employees attended in-service training on their duties including how to deal with emergencies, fires, and escorting patients.   Such training related to employees' jobs by, for example providing instruction on techniques to be used by employees when performing their jobs and regularly occurred during working hours.

164.   Even though defendants know or should have known their employees are performing such work, defendants fail to compensate their employees for such work.

165.   Defendants' Unpaid Training Policy is also legally challengeable in several respects.

166.   First, defendants fail to ensure that employees are compensated for all training time, despite requiring employees to complete such training.

167.   Second, consistent with routinely paying employees only for their scheduled shifts, defendants shift their statutory obligation to record and pay for all hours worked by requiring employees to record time for training performed.

168.   Third, the Unpaid Training Policy results in extensive uncompensated work

being performed by employees.

169.   As described by the Plaintiff, he often completed training and their experiences are shared by Class Members.

170.   The amount and frequency of such uncompensated work was so substantial that it reflects the defendants' actual policy or practice for the compensation of Class Members for training.

171.   Fourth, defendants do not have available to them the defense that they have used all reasonable efforts to prevent uncompensated work from being performed and all reasonable efforts to inquire as to whether such work was being performed.

172.   As above, the defendants made no efforts to prevent Plaintiff and Class Members from training without compensation nor did they inquire about whether employees were performing training without compensation.  They also failed to conduct regular and effective audits and surveys which would have revealed the uncompensated work; to adequately monitor employees to ascertain whether uncompensated work is being performed and to enforce policies which ensure compensation for all time worked; to systematically review the records of their employees' work to determine if uncompensated work is being performed and whether there are inconsistencies between those records and the wage payments to Plaintiff and Class Members; and to engage in effective training of their managers or their employees to ensure they understand that employees must be compensated for all hours worked, including training time.

173.   Moreover, reasonable efforts to record and pay employees properly would not include shifting to employees defendants' statutory obligations of properly recording time and compensating employees.

174.   The defendants did not routinely discipline employees who fail to record training time.

175.   This additional uncompensated time should have been paid at overtime rates when Plaintiff, as discussed above, and Class Members' scheduled shifts exceeded 40 hours in a week, or when the uncompensated time from missed or interrupted meal breaks, pre- and post-schedule work, and training time, pushed their hours for the week over 40.

176.   All Plaintiffs and Class Members subject to the Unpaid Training Policy are members of Class C.

177.   Collectively, the Meal and Break Deduction Policy, the Unpaid Pre- and Post-Schedule Work Policy, and the Unpaid Training Policy are referred to herein as the "Unpaid Work Policies."

### Additional Allegations

178.   Plaintiff and Class Members were subject to defendants' timekeeping policies which fail to ensure that employees are compensated for all hours worked, including pursuant to the Unpaid Work Policies.

179.   Even though defendants permitted its employees to perform such work, defendants still fail to compensate their employees for this time.

180.   Defendants' practice is to be deliberately indifferent to these violations of the statutory wage and overtime requirements.

181.   For example, through the paystubs and payroll information they provided to employees, defendants deliberately concealed from their employees that they did not receive compensation for all compensable work that they performed and misled them into believing they were being paid properly.

182.   Indeed, defendants, through their corporate publications and through statements of their agents, represented that wages would be paid legally and in accordance with defendants' obligations pursuant to applicable laws.

183.   Defendants misrepresented in their employee manuals and policy manuals to Plaintiff and Class Members that they would be paid for all hours worked including those worked both under and in excess of forty in a work week.

184.   Defendants intended for Plaintiff and Class Members to rely upon defendants' misrepresentations that they would be paid for all the time worked, including applicable premium pay.

185.   However, at all times, defendants intended to violate applicable laws by failing to pay Plaintiff and Class Members for all the time worked, including applicable premium pay.

186.   Further, by maintaining and propagating the illegal Unpaid Work Policies, defendants deliberately misrepresented to Plaintiff and Class Members that they were being properly paid for all compensable time, even though Plaintiff and Class Members were not receiving pay for all time worked including applicable premium pay.

187.   The Plaintiff and Class Members are not experts in proper payment under labor laws, and more specifically are not aware of what time is compensable for interrupted and missed meal breaks, nor how the defendants' internal computer systems were determining the amount they were being paid.

188.   Further, when questioned, the defendants falsely assured Plaintiff and Class Members that the defendants understood federal and state labor laws and that based on that knowledge, the defendants were ensuring that they were properly paying the Plaintiff and

Class Members.

189.   The defendants made this representation despite the fact that such claims were false, fully knowing that Plaintiff and Class Members were relying on the defendants' "expertise" and assurances.

190.   Further, these assurances were not contradicted by the information in legal postings required by state or federal law to be displayed prominently at places of work to which Plaintiff and Class Members had access.

191.   Prior to seeking legal advice from Class Counsel, the Plaintiff was never alerted to the defendants' concealment of their violation of the law by failing to pay the Plaintiff and Class Members properly.   Plaintiff and Class Members are under no duty to inquire of defendants that they were paid for all hours worked including applicable premium pay.

192.   Further, not until the commencement of this action were Class Members made aware that the defendants' conduct in fact violated the law. As a result, employees were unaware of their claims.

193.   The defendants engaged in such conduct and made such statements to conceal from the Plaintiff and Class Members their rights and to frustrate the vindication of the employees' rights.   Such conduct by the defendants equitably tolls the statute of limitations covering Plaintiff's and Class Members' claims and defendants are estopped from asserting statute of limitations defenses against Plaintiff and Class Members.   Defendants' failure to pay overtime as required by the FLSA is willful.

194.   Among the relief sought, Plaintiff and Class Members seek injunctive relief to prevent defendants from continuing the illegal policies and practices perpetuated pursuant to the Unpaid Work Policies.

195.   Additionally, as set forth in the allegations above, the defendants fraudulently concealed from the Plaintiff and Class Members the facts that are the basis for their claims.

196.   Because of such conduct, the Plaintiff and Class Members did not discover in the relevant statute of limitations period that the defendants were not paying them properly.

197.   The Plaintiff and Class Members exercised due diligence, but still were unaware of their rights.

198.   Defendants failed to act in good faith by failing to pay wages and overtime as required by New York Labor Law.

199.   As a direct and proximate cause of defendants' failure to act in good faith, defendants violated the New York Labor Law.

200.   In addition to the loss of wages, Plaintiff and Class Members have suffered non-economic harm as a result of defendants' policies.  These included, but are not limited to, the personal loss of break and rest time, personal suffering and emotional distress.

201.   Because defendants' Unpaid Work Policies involve an employer intentionally misleading and deceiving employees about their wages, and withholding wages legally and properly payable to employees, they are policies that are against the strong public policy of the State of New York with respect to employees' wages.

202.   Defendants failed to pay all wages due to Plaintiff and Class Members on regular days designated in advance pursuant to New York Labor Law.

203.   Plaintiff and Class Members also allege that defendants have engaged in a failure to keep accurate records in the course of maintaining their Unpaid Work Policies in their dealings with Plaintiff and Class Members.

204.   As such, defendants failed to make, keep and preserve true and accurate

records of the hours worked by Plaintiff and Class Members in violation of New York Labor Law.

205.   Plaintiff and Class Members were not classified as exempt employees because hourly employees do not fall under one of the enumerated exemptions under the FLSA or NYLL.

## FIRST CAUSE OF ACTION[2]
### *FLSA*

206.   Plaintiff and Class Members reallege the above paragraphs as if fully restated herein.

207.   Defendants willfully violated their obligations under the FLSA and are liable to Plaintiff and Class Members.

## SECOND CAUSE OF ACTION
### *New York Labor Law*

208.   Plaintiff and Class Members reallege the above paragraphs as if fully restated herein.

209.   As a direct and proximate cause of defendants' acts, including defendants' failure to act in good faith, defendants willfully violated the New York Labor Law and Plaintiff and Class Members have suffered damages pursuant to N.Y. LAB. LAW § 190(8), N.Y. LAB. LAW § 191 *et seq.*, including N.Y. LAB. LAW §§ 191, 193, 198, and N.Y. COMP. CODES R. & REGS. § 142-2.2.

**WHEREFORE**, Plaintiff and Class Members demand judgment against defendants in their favor and that they be given the following relief:

---

[2]      Pursuant to § 216(b), plaintiff attaches opt-in consent forms as <u>Exhibit D</u>.

(a)     an order preliminarily and permanently restraining defendants from engaging in the aforementioned pay violations;

(b)     an award crediting Plaintiff and Class Members for all hours worked;

(c)     an award of the value of Plaintiff's and Class Members' unpaid wages and overtime;

(d)     liquidated damages under the FLSA equal to the sum of the amount of overtime which was not properly paid to Plaintiff and Class Members;

(e)     under N.Y. LAB. LAW § 198, an additional amount as liquidated damages up to one-hundred percent of the total amount of wages found to be due;

(f)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Plaintiff's and Class Members' rights;

(g)     an award of pre- and post-judgment interest;

(h)     the amount equal to the value which would make Plaintiff and Class Members whole for the violations; and

(i)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

## <u>JURY DEMAND</u>

Plaintiff demands a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: May 25, 2012

THOMAS & SOLOMON LLP

By: _____
J. Nelson Thomas, Esq.
Michael J. Lingle, Esq.
Annette Gifford, Esq.
Jessica L. Witenko, Esq.
*Attorneys for Plaintiff and Class Members*
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
mlingle@theemploymentattorneys.com
agifford@theemploymentattorneys.com
jwitenko@theemploymentattorneys.com