UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
JEROME CROMWELL *on behalf of himself and all other*                    :
*employees similarly situated*,                                         :
                                                                        :
                                        Plaintiff,                      :       12 Civ. 4251 (PAE)
                                                                        :
                        -v-                                             :       OPINION & ORDER
                                                                        :
NEW YORK CITY HEALTH AND HOSPITALS CORP.                                :
et al.,                                                                 :
                                        Defendants.                     :
                                                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

On June 10, 2013, plaintiff Jerome Cromwell ("Cromwell") filed a Second Amended Complaint against the New York City Health and Hospitals Corporation ("HHC") and Alan D. Aviles, HHC's chief executive officer (collectively, "defendants"). Dkt. 38. Cromwell seeks to recover, on his own behalf and that of a putative class of employees, unpaid wages allegedly owed to hourly employees for work performed before and after scheduled shifts, and during meal periods and breaks. Cromwell asserts that defendants deprived him and similarly situated HHC employees of overtime and gap-time pay, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and/or New York Labor Law ("NYLL") §§ 191 *et seq.*[1]

On July 8, 2013, defendants moved to dismiss Cromwell's NYLL claims against HHC in their entirety, on the ground that HHC is a political subdivision of New York State and therefore

---

[1] Cromwell's original Complaint was filed on May 30, 2012. Dkt. 1. On December 10, 2012, he filed a First Amended Complaint ("FAC"). Dkt. 25. On May 5, 2013, the Court dismissed the FAC's FLSA claims, because the FAC failed to allege any particular workweek involving uncompensated overtime during which Cromwell worked more than 40 hours. Dkt 37 (citing *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013)). The Court declined to exercise supplemental jurisdiction over the FAC's NYLL claims. *Id.* The Court's dismissal was without prejudice, with leave to amend "to meet the pleading standards articulated in *Lundy*." *Id.* at 9. Cromwell was also permitted to renew his NYLL claims. *Id.*

exempt from the NYLL's wage provisions. Dkt. 42 ("Def. Br."). On July 22, 2013, Cromwell submitted his opposition. Dkt. 43 ("Pl. Br."). On July 29, 2013, defendants replied. Dkt. 44 ("Def. Rep. Br.").

For the reasons that follow, the Court grants defendants' partial motion to dismiss.

## I.     Factual Allegations[2]

Between October 10, 1989, and February 1, 2010, Jerome Cromwell worked as a hospital police officer at Woodhull Medical and Mental Health Center, a medical facility of the HHC.[3] SAC ¶ 68. As a member of the International Brotherhood of Teamsters Local 237, Cromwell was subject to the union's collective bargaining agreement. *Id.* ¶ 69. Cromwell's official duties included patrolling and protecting the Woodhull facility and monitoring patient and visitor activities. *Id.* ¶ 70. Cromwell was required to carry a pager and immediately to respond to emergency calls received during his scheduled shifts. *Id.*

Between May 2006 and February 2010 (the "Relevant Time Period"), Cromwell typically worked five days per week between 11 p.m. and 7 a.m., totaling 37.5 hours of scheduled work. *Id.* ¶ 71. Cromwell alleges that, during 35% of his workweeks, he worked an additional 7.5-hour shift, resulting in a total of 45 hours worked during those weeks. *Id.*

Cromwell alleges that he worked additional time, for which he was not compensated, before and after his scheduled shifts, as well as during his meal periods and breaks. *Id.* ¶ 73.

---

[2] The Court's account of the underlying facts in this case is drawn from the Second Amended Complaint. Dkt. 38 ("SAC").

[3] HHC hospitals include: (1) Bellevue Hospital Center; (2) Kings County Hospital Center; (3) Jacobi Medical Center; (4) Elmhurst Hospital Center; (5) Harlem Hospital Center; (6) Coler-Goldwater Specialty Hospital and Nursing Facility; (7) Metropolitan Hospital Center; (8) Lincoln Medical and Mental Health Center; (9) North Central Bronx Hospital; (10) Coney Island Hospital; (11) Woodhull Medical and Mental Health Center; and (12) Queens Hospital Center. SAC ¶ 17.

Cromwell estimates that the uncompensated work before his scheduled shifts amounted to an additional one hour of work each shift, and that the uncompensated work after his shifts amounted to an additional 20 minutes of work twice per week. *Id.* ¶ 74. Finally, Cromwell alleges that he was required to work through his entire 30-minute meal break once a week and that, once a week, his meal breaks were disrupted by work-related interruptions lasting at least 15 minutes. *Id.* ¶¶ 76–77. Cromwell asserts that missed meal breaks totaled an additional one hour per week of uncompensated time. *Id.* ¶ 78.

Cromwell alleges that he worked these uncompensated hours as a result of HHC policy. For instance, Cromwell asserts, HHC had a "Meal and Break Deduction Policy" under which HHC's timekeeping system automatically deducted time from employees' paychecks each day for meals, breaks, and other deductible periods of time. *Id.* ¶¶ 89–90. For each shift that was long enough for a meal break, 30 minutes was automatically deducted from employees' pay base. *Id.* ¶ 91. Cromwell claims that he and other members of the class he seeks to represent performed work during these automatically deducted breaks, and that defendants failed to prohibit employees from working during these breaks. *Id.* ¶ 92–96.

Another relevant HHC policy is the "Unpaid Pre- and Post-Schedule Work Policy." *Id.* ¶ 122. Under this policy, Cromwell claims, he and other employees were permitted to perform work before and after the end of their scheduled shifts, but were not permitted to record this work so as to be paid for it. *Id.* ¶¶ 125–26. Cromwell also alleges that defendants failed to prohibit employees from completing work before and after their scheduled shifts. *Id.* ¶¶ 129–50.

In total, Cromwell estimates, HHC caused him to work six hours and 40 minutes of uncompensated time during weeks in which he worked the standard five shifts, and seven hours and 40 minutes of uncompensated time during the 35% of weeks in which he worked an extra

3

shift.  For the weeks in which he worked an extra shift, Cromwell asserts he should have been paid at the overtime rate for the entire seven hours and 40 minutes, because all of his "uncompensated hours were in excess of 40."  *Id.* ¶¶ 75–78.  For the weeks in which he worked just five shifts, Cromwell asserts he should have been paid at his regular hourly rate for 2.5 hours, bringing his weekly hours to 40, and at the overtime rate for the balance of four hours and 10 minutes.  *Id.*  Back-pay for the 2.5 hours needed to reach a 40-hour week is called "gap-time" compensation.  *See Nakahata v. N.Y. Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013) ("Gap-time claims are those in which an employee has not worked 40 hours in a given week but seeks recovery of unpaid time worked, or in which an employee has worked over 40 hours in a given week but seeks recovery for unpaid work under 40 hours.") (citing *Lundy*, 711 F.3d at 115).  Claims for gap-time compensation are cognizable under the NYLL but not under the FLSA.  *Nakahata*, 723 F.3d at 201–02 (The "FLSA does not provide a cause of action for unpaid gap time," but "*Lundy* acknowledged, without deciding, that a gap-time claim would be consistent with the language of NYLL § 663(1).").

In money damages, Cromwell seeks: (1) an award of the value of "unpaid wages and overtime"; (2) "liquidated damages under the FLSA equal to the sum of the amount of overtime which was not properly paid to Plaintiff and Class Members"; and (3) "an additional amount of liquidated damages up to one-hundred percent of the total amount of wages found to be due" under NYLL § 198.  *Id.* ¶ 182.  Cromwell therefore seeks, under the NYLL, compensation for unpaid overtime and gap-time, as well as an additional 100% of that amount as liquidated damages.  Under the FLSA, Cromwell seeks only liquidated damages for unpaid overtime.

**II.     Applicable Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. The Court "need not accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted).[4]

In considering a Rule 12(b)(6) motion, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citing *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)). Courts may not "consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim." *Nakahata*, 723 F.3d at 202 (citation omitted). Here, the Court has considered only the SAC, the two documents Cromwell appended

---

[4] For instance, Cromwell asserts that "HHC is not a political subdivision as intended under the New York Labor Law." SAC ¶ 21. That is a legal conclusion the Court need not credit on HHC's motion to dismiss.

5

as exhibits to his SAC, and any documents incorporated into the SAC by reference. *See* Dkt. 38.[5]

## III.   Discussion

Defendants' motion to dismiss presents a question of law:  Is HHC a political subdivision of New York State and therefore exempt from the NYLL?

NYLL excludes from its definition of "employee" those individuals employed "by a federal, state or municipal government or political subdivision thereof."  NYLL § 651(5); *see also* N.Y.C.R.R. § 142-2.14(b) ("Employee does not include any individual employed by a Federal, State or municipal government or political subdivision thereof.").  Therefore, if HHC is a "political subdivision," then NYLL's wage provisions do not apply to HHC's employees, and the Court must dismiss Cromwell's NYLL claims (both for overtime and gap-time pay).

Public benefit corporations like HHC are not automatically considered political subdivisions for all purposes under New York law. *See John Grace & Co., Inc. v. State Univ. Constr. Fund*, 44 N.Y.2d 84, 88 (1978) (fact that a public benefit corporation was created by the State and "engages in operations which are fundamentally governmental in nature does not inflexibly mandate a conclusion that it is the State or one of its agencies").  Instead, New York courts conduct a "particularized inquiry" into whether the public benefit corporation "should be treated like the State" for the "specific purpose" presented. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 386 (1987); *see also John Grace*, 44 N.Y.2d at 88 ("[A]

---

[5]  With its motion to dismiss, HHC filed a Declaration of Benjamin Welikson with four exhibits: (A) the Citywide Collective Bargaining Agreement; (B) the Operating Agreement between HHC and N.Y. City; (C) HHC's Workers' Compensation Self-Insurance form; and (D) the appellant's brief in *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382 (1987).  Under Rule 12(d), a motion to dismiss "must be treated as one for summary judgment under Rule 56" if "matters outside the pleadings are presented to and not excluded by the court."  Because these exhibits are unnecessary for the resolution of HHC's motion to dismiss, the Court has not considered them.

particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it is required."). Courts must focus on "the nature of the employing organization" in deciding whether to treat it as a political subdivision for NYLL purposes. *Faculty Student Ass'n of State Univ. of Oneonta, Inc. v. Ross*, 54 N.Y.2d 460, 462–64 (1981) (holding a faculty-student organization at the State University of Oneonta was not a political subdivision and was thus required to pay its non-student employees a minimum wage under the NYLL).

In *Clark-Fitzpatrick*, the New York Court of Appeals held that the Long Island Railroad Company ("LIRR") should "receive the same immunity from punitive damages as do the State and its political subdivisions." 70 N.Y.2d at 387. The court focused its inquiry on two facts: that (1) the LIRR and its parent organization, the Metropolitan Transportation Authority ("MTA"), were charged with performing the "essential government function" of developing "commuter services essential to the economic health of the State"; and (2) the LIRR and MTA were "public benefit corporation[s] heavily supported by tax dollars." *Id.* at 386–88. Considering the public nature of LIRR's operations and the public source of its funding, the Court of Appeals held that the LIRR was properly categorized as a political subdivision under New York law, and thus was not subject to suits for punitive damages.

By contrast, in *John Grace*, the Court of Appeals held that a public benefit corporation, the State University Construction Fund ("Fund"), was distinct from New York State. It therefore did not have to follow various laws requiring state agencies to adjust building contracts to reflect increased steel and petroleum prices. 44 N.Y.2d at 89. In distinguishing the Fund from the State, the court noted, *inter alia*, that the Fund could: (1) enter into contracts without independent bidding on subdivisions of work while the State could not; (2) choose not to require a contractor bond while the State could not; and (3) make full progress payments while the State

7

had to withhold 10% of each payment. *Id.* In light of the different rules applicable to the State and the Fund, the court held that the Fund was "not identical with the State" for purposes of entering into building contracts. *Id.* at 90.

The guiding question under New York law is thus whether the entity is sufficiently like the State for the purpose at issue, such that it should be treated like the State for that purpose. *See John Grace*, 44 N.Y.2d at 88 (if the enabling statute imbues the public benefit corporation "with such a degree of identity as to be considered an integral part of the State qua State," that corporation should be deemed a political subdivision). Does HHC's enabling statute make it so much like the State that it should—like the rest of the State—be exempt from the NYLL?

No New York State court has squarely addressed this question. However, courts in this district have twice dismissed NYLL claims against HHC on the grounds that HHC is a political subdivision of the State for NYLL purposes. *See Ali v. N.Y.C. Health & Hosps. Corp.*, No. 11 Civ. 6393 (PAC), 2013 WL 1195794 (S.D.N.Y. 2013) (Crotty, J.) (granting motion to dismiss NYLL claims brought against HHC); *Drayton v. MetroPlus Health Plan, Inc.*, 791 F. Supp. 2d 343 (S.D.N.Y. 2011) (Rakoff, J.) (granting motion to dismiss NYLL claims brought against MetroPlus, a wholly-owned subsidiary of HHC).

In *Drayton*, Judge Rakoff concluded that "New York courts are overwhelmingly likely to hold that HHC is a political subdivision for purposes of [the NYLL]." 791 F. Supp. 2d at 347. The court began its analysis with the language in HHC's enabling statute, *see* N.Y. Unconsol. Laws §§ 7381 *et seq.* ("HHC Act"), which, like the MTA Act, expressly states that HHC was constituted to perform the "essential public and governmental function" of providing and delivering "comprehensive care and treatment for the ill and infirm," which "is in all respects for the benefit of the people of . . . New York." HHC Act § 7382; *see also Council of the City of*

8

*N.Y. v. Giuliani*, 93 N.Y.2d 60, 72 (1999) ("HHC was created to fulfill a critical public mission—the provision of comprehensive, quality health care services to the poor and uninsured residents of the City."). The court also observed that HHC, like the MTA and LIRR, "receives a substantial amount of financial support from public sources of funding." 791 F. Supp. 2d at 346. In fact, the statute itself guaranteed public funding. *See* HHC Act § 7386(1)(a) (New York City "shall include in its expense budget an appropriation of tax levy for the services provided by [HHC] and pay [HHC] an amount which shall not be less than one hundred seventy-five million dollars"). In 2011, HHC received subsidies of more than $183 million from New York City, $73 million from New York State, and $20 million from the federal government. HHC Budget Report, dated April 13, 2012, *available at* http://www.nyc.gov/html/hhc/downloads/pdf/hhc-paris-2011-2016.pdf.[6]

In addition to these considerations, exposing HHC to suit under the NYLL would potentially subject HHC to paying, in addition to back wages, 100% liquidated damages. *See* NYLL § 198 ("the court shall allow such employee to recover the full amount of any underpayment . . . and unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to *one hundred percent* of the total amount of the wages found to be due") (emphasis added). The remedies provided by the NYLL thus extend beyond those available under the FLSA, whose applicability to HHC defendants do not dispute. Importantly, under

---

[6] Plaintiff argues that the Court should not consider HHC's budget figures on a motion to dismiss. *See* Pl. Br. at 21. However, in his SAC at ¶ 46, plaintiff himself draws upon those disclosures, stating: "according to the New York City Council's HHC Budget Overview for 2011, approximately 80% of the $6.7 billion operating budget was derived from third party revenue." The HHC Budget is therefore "incorporated in the complaint by reference." *See Leonard F.*, 199 F.3d at 107.

New York law, the State and its political subdivisions are not subject to punitive damages. "[T]he goals of punishment and deterrence are not served when punitive damages are imposed against the State, for in such circumstances, it ultimately is the innocent taxpayer who is punished." *Clark-Fitzpatrick*, 70 N.Y.2d at 386 (citing *Sharapata v. Town of Islip*, 56 N.Y.2d 332, 338 (1982)). In *Clark-Fitzpatrick*, the Court of Appeals held LIRR exempt from punitive damages, noting that its role in commuter transportation served the public's interest, and "[b]urdening so important a public function by the imposition of punitive damages would . . . not be desirable." 70 N.Y.2d at 388. The same logic applies here, because HHC also serves an essential governmental function: It provides comprehensive care and treatment to the ill and infirm, including the uninsured. Imposing 100% liquidated damages on HHC would disserve public interest, particularly because such a penalty, in all likelihood, would either diminish HHC's resources or fall on the blameless taxpayer.

Exempting HHC from the NYLL is further consistent with the law's overall treatment of HHC, including in the employment context. HHC's employees are "subject to [Art. 14] of the civil service law and for all such purposes" are deemed "public employees." HHC Act § 7390(5). The "Public Employees' Fair Employment Act," also known as the "Taylor Act," N.Y. Civil Service Law §§ 200 *et seq.*, which was enacted to "promote harmonious and cooperative relationships between government and its employees," covers HHC employees. *See House v. N.Y.C. Health & Hosps. Corp.*, 437 N.Y.S.2d 109 (1981), *aff'd sub nom. Comm. of Interns & Residents v. N.Y.C. Health & Hosps. Corp.*, 55 N.Y.2d 754 (1981) (enforcing Civil Service Law § 210 penalties against striking interns and residents employed by HHC). HHC employees are also subject to New York City's Collective Bargaining Law, which applies only to public sector municipal employees. *See* N.Y. Admin. Code § 12-303(g) (defining "the New

York city health and hospitals corporation" as a "public employer" for collective bargaining purposes).  HHC is also deemed a political subdivision for purposes of §§ 175(a) and 175(b) of the State finance law, *see* HHC Act § 7384-a, and for purposes of New York's Freedom of Information Law ("FOIL").  *See M. Farbman & Sons, Inc. v. N.Y.C. Health & Hosps. Corp.*, 62 N.Y.2d 75, 79 (1984) (treating HHC as a governmental agency subject to FOIL's "legislative declaration that government is the public's business").  Finally, HHC employees may be charged with violating the "Official Misconduct" provisions in New York Penal Law § 195.00.  *See People v. Abranko*, 599 N.Y.S.2d 447 (Crim. Ct. 1993).  In *Abranko*, an emergency medical technician employed by HHC's ambulance service moved to dismiss a count of official misconduct on the ground that he was not a public servant under New York Penal Law § 10.00(15) (defining a public servant as "any public officer or employee of the state or of any political subdivision thereof or any governmental instrumentality within the state").  The court denied the motion to dismiss because HHC employees are covered by the civil service law and are deemed "public employees" under the HHC Act.  Accordingly, the court held, the technician was a public servant and could be charged with official misconduct.

Finally, HHC is deemed a political subdivision under federal employment law.  The National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("NLRA"), excludes from its definition of an employer "any State or political subdivision thereof."  29 U.S.C. § 152(2).  In *Muhlrad v. Mitchell*, No. 96 Civ. 3568 (DLC), 1997 WL 182614 (S.D.N.Y. 1997) (Cote, J.), the court concluded that because "HHC is not within the definition of employer" under the NLRA, the plaintiff's federal claims should be dismissed.  *Id.* at *4; *see also Szucs v. Comm. of Interns & Residents*, No. 95 Civ. 1168 (JES)(KNF), 2001 U.S. Dist. LEXIS 1113 at * 12 (S.D.N.Y. Feb. 9, 2001) (the NLRA "does not apply to public employers and HHC is a public employer").  HHC

11

has also been deemed "a political subdivision of the State of New York" for purposes of exempting HHC "from antitrust liability pursuant to the state action doctrine." *See Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 184–85 (W.D.N.Y. 1996).

The Court's particularized inquiry thus reveals that HHC: (1) was statutorily created to serve an essential public and governmental function; (2) receives substantial public funding; and (3) is widely characterized as a political subdivision and public employer under both state and federal law. Additionally, the fact that employers covered by the NYLL are subject to paying 100% in liquidated damages, on top of liability for back wages, favors exempting HHC, particularly given HHC's public mission and funding. The Court thus agrees that it would be incongruous to "carve out an isolated area of law in which HHC is not considered a governmental entity." *Drayton*, 791 F. Supp. 2d at 347.[7]

---

[7] One court has held that HHC is not a political subdivision for purposes of NYLL. *See Massiah v. MetroPlus Health Plan, Inc.*, 856 F. Supp. 2d 494 (E.D.N.Y. 2012). It found no reason to exempt HHC from compliance with the NYLL, because HHC fails to "dominate the service area in which it operates" and functions like its "counterparts in the private or not-for-profit sector." *Id.* at 498–500. Although this Court has considered the *Massiah* court's thoughtful analysis, in the end, those considerations do not carry the day, given the persuasive reasons chronicled above to treat HHC as a political subdivision for NYLL purposes. Further, whether an entity "dominates the field" is a fluid and uncertain inquiry, which may turn on how one defines the field: Is HHC's field providing healthcare in general (in which case HHC would be competing with private sector counterparts) or specifically providing healthcare for the uninsured (in which case it would not be)? *See* SAC ¶ 45 ("[A]pproximately 35% of the people served [by HHC] are uninsured."). By the same token, LIRR's field may alternatively be cast as transportation (in which case it would be competing with private sector modes of transit) or mass commuter transportation into New York City (in which case much less so). As for the *Massiah* court's observation that HHC functions like its private sector counterparts, that factor is not controlling, because one purpose of public benefit corporations is to provide governmental functions through more efficient, flexible means, often patterned on or borrowed from the private sector. Using that consideration, few public benefit corporations would ever qualify as political subdivisions, despite ample case law to the contrary. The New York courts instead focus on whether the public benefit corporation's enabling statute makes it an integral part of the State—and, relevant to this inquiry, whether it: (1) performs an essential public function; (2) receives public funding; and (3) is treated like the State in other areas of law. As explained above, those factors favor exempting HHC from the NYLL.

## CONCLUSION

For the reasons stated in the foregoing, the Court holds that HHC is a political subdivision of New York State for NYLL purposes, and grants HHC's motion to dismiss plaintiffs' NYLL claims with prejudice. The Clerk of Court is directed to terminate the motion pending at docket number 40.

Defendants are directed to submit an answer to the FLSA overtime claims contained in the Second Amended Complaint by October 30, 2013. The parties are directed to meet and confer by November 6, 2013 and to submit, by November 13, 2013, a joint proposed Case Management Plan, under which fact discovery is to be completed by four months from today.

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: October 16, 2013
       New York, New York